## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JAMES ANTIWON CHASE,

      **Plaintiff,**

v.                                CIVIL ACTION NO. 1:11cv108
                                             (Judge Keeley)

**GEORGE TRENT, et al.,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I. BACKGROUND

On July 14, 2011, the plaintiff initiated this action by filing a state civil rights complaint pursuant to 48 U.S.C. § 1983. (Doc. 1). On July 19, 2011, the plaintiff was granted leave to proceed in forma pauperis. (Doc. 7). On September 15, 2011, the plaintiff paid the required initial partial filing fee. (Doc. 16). On February 22, 2012, the undersigned conducted an initial review of this matter and determined that summary dismissal was not warranted. Accordingly, an Order to Answer was entered and a summons was issued for the defendant. (Doc. 24). The defendant filed a motion to dismiss or, in the alternative, motion for summary judgment on March 19, 2012. (Doc. 20). On March 20, 2012, a Roseboro Notice was issued. (Doc. 31). On July 6, 2012, the plaintiff filed a reply. (DE 48).

### II. THE PLEADINGS

**A. The Complaint**

In his complaint, the plaintiff alleges that the defendant violated the Eighth and Fourteenth

1

Amendments to the United States Constitution by being deliberately indifferent to his safety. More specifically, the plaintiff alleges that, upon his arrival at the North Central Regional Jail, other inmates became aware of his sexual orientation and HIV-positive diagnosis. He alleges that he filed a grievance form, asking to be moved from his housing unit. He maintains that this request was denied.

The plaintiff further alleges that, on April 22, 2009, inmates were allowed to raid his cell while he was attending court. He alleges that these inmates came into possession of his confidential medical records, including records concerning his HIV status. He alleges that he subsequently filed a second grievance form, again asking that he be moved from his housing unit. He alleges he then was moved to three different housing units, ultimately arriving in Unit A7.

The plaintiff alleges that he asked to be moved from Unit A7 because inmates were housed in that unit who had previously lived on units with him. He claims that his request was denied. Subsequently, the plaintiff alleges that on August 7, 2009, another inmate severely assaulted him while making references to his sexual orientation and medical status. He alleges that as a result of his injuries, he spent time in the hospital, followed by a six-week stay in the medical unit of the North Central Regional Jail.

For relief, the plaintiff seeks general and punitive damages as well as any other relief that the Court finds appropriate

**The Defendant's Motion**

In response to the complaint, the defendant asserts that the plaintiff's complaint should be dismissed for the following reasons:

(1) The plaintiff has not alleged, and cannot prove, a viable Eighth Amendment claim.

(2) The plaintiff's Fourteenth Amendment claim is more properly considered an Eighth Amendment claim and, as such, should be dismissed.

## C. <u>Plaintiff's Response</u>

In his response, the plaintiff argues that the defendant should have known of the risk to his safety based upon his "effeminate characteristics" and HIV status. He also argues that the precautions taken by the defendant were not precautions that a reasonable person would have taken.

## D. <u>Defendant's Reply</u>

In his reply, the defendant argues that the issue of what he **should** have known about the risk to the plaintiff is irrelevant. Instead, the only relevant question is whether he had actual knowledge of an excessive risk to the plaintiff's safety. Furthermore, the defendant argues that to the extent one could argue that he knew of a substantial risk, neither he nor anyone else at the NCRJ acted unreasonably to said risk.

## III. STANDARD OF REVIEW

### A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir.1993); <u>see also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," (Id). (citations omitted), to one that is "plausible on its face," (Id). at 570, rather than merely "conceivable." (Id). Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. (Id).

**B. Summary Judgment**

When a motion to dismiss is accompanied P by affidavits, exhibits and other documents to

be considered by the court, the motion will be construed as a motion for summary judgment. Fed. R. Civ. P. 12(d). Here, the motion filed by the defendants was accompanied by exhibits.

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 *1986).

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242-252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." (Id) "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 587-88 1986).

## IV. ANALYSIS

### A. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[1] and is required even when the relief sought is not available. Booth at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter, 534 U.S. at 524 (citing Booth, 532 U.S. at 741) (emphasis added).

It is undisputable and Plaintiff admits that the West Virginia Regional Jail Authority makes available to its inmates a grievance procedure through which they may seek review of complaints related to the conditions of their confinement. (DE 1, p. 2). Under this procedure, inmates must first submit a grievance to the Administrator of the facility in which they are confined. Upon receipt of the grievance, the Administrator may reject the grievance if it appears on its face to have been filed in bad faith, or if other administrative procedures exist that have not been utilized. If the grievance is rejected, the Administrator must advise the inmate of the rejection. If the grievance is not rejected, the Administrator may assign a staff member to investigate the complaint. Such staff is then required to submit a written report within forty-eight (48) hours. Within two days of receipt of the written report, the Administrator must provide a written decision which identifies the action taken,

---

[1] Id.

the reasons for the action, and the procedures that must be followed to properly appeal the decision. If the Administrator's response is unfavorable, the inmate may appeal to the Chief of Operation within five days of the receipt of the Administrator's decision. Upon receipt of an appeal, the Chief of Operations must immediately direct the Administrator to forward copies of all information relating to the inmate's grievance within two business days. The Chief of Operations may direct an investigation of the report be conducted and a written report be submitted within 15 days. Within 10 days of receiving all of the information related to the grievance, the Chief of Operations must provide a written decision which identifies the corrective action taken or the reasons for denying the grievance. If the Chief of Operations' response is unfavorable, the inmate may appeal to the Office of the Executive Director within five days of receipt of the Chief of Operations' response. To do so, the inmate must mail to the Executive Director, copies of the original complaint and all of the responses thereto. The Office of the Executive Director must respond to an inmate's appeal within 10 days of receiving all the information. Unless the inmate has been notified of an extension of time for a response, the inmate may move to the next stage of the grievance process if the inmate does not receive a response at the expiration of the time limit at any stage of the process. The grievance process must be concluded within 60 days, inclusive of any extensions.

The plaintiff's complaint and attachments raise doubt whether he, in fact, fully exhausted his administrative remedies. However, the defendant has not raised the affirmative defense that the plaintiff failed to exhaust. Accordingly, the undersigned has no option but to address the merits of the complaint.

B. **Failure to Protect**

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from

7

violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with "'deliberate indifference' to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. Id. n3. However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837. Furthermore, the Eighth Amendment is not violated by the negligent failure to protect inmates from violence, the plaintiff must show that the defendants knew of the risk and consciously disregarded it. Whitley v. Albers, 475 U.S. 312. 319 (1986); Moore v. Winebrenner, 927 F.2d 1312 (4th Cir. 1991).

On arrival at North Central Regional Jail [NCRJ] Plaintiff was assigned to pre-sentence pod C8 notwithstanding that he had already been sentenced. (DE1, p. 4).

While Plaintiff was away from NCRJ for an April 22, 2009 Court hearing or doctors appointment, his cell was ransacked by other inmates when the doors to cells were left open by a member of the prison staff. Personal records were located in Plaintiff's cell. Plaintiff claims they included medical records showing he was HIV positive. Plaintiff alleges he filed a grievance on April 23, 2009. (DE 1, p. 4 and Ex. A). The grievance was directed to "George Trent" and by way

of relief Chase asked that he be moved to "a sentence pod". Chase claimed in the grievance that "with my medical condition exposed I'm subjected ridicule and discrimination and I'm in fear for my life. Please Do Something!" (DE 1, Ex. A).

Correction officer Toothman moved Plaintiff to POD C3. Plaintiff alleges "several remarks from inmates concerning [Chase's] health, race and sexual orientation" were made and he was "moved to B5 and than [sic] to A7." (DE 1, p. 4).

Plaintiff alleges he filed a second grievance form again directed to "George Trent." (DE 1, Ex. B). The date of the grievance is not legible. Plaintiff reiterates his complaint and fear. He also notes he has been moved to C3 from C8. He writes: "Being moved to a sentence section isn't going to stop the discrimination and ridicule I'm faced with." Plaintiff requests he be provided with a protected living area and that he be informed what actions are being taken against the tower officer who rolled open his cell door on April 22, 2009.

Plaintiff contends he "requested to be moved because inmates that lived with me previously were on A7." (DE1, p. 4). A careful review of the grievances Plaintiff claims he filed [Ex. B and Ex. C] reflects Plaintiff did not identify a single inmate who was with him on C8, C3 and A7 who knew of his medical condition or who allegedly ridiculed him.

The defendant does not dispute that while housed in POD A7 plaintiff was assaulted by inmate Chad Cheevers on August 7, 2009. (DE1, Ex. D). However, the record does not demonstrate that the defendant was aware of facts from which an inference could be drawn that a substantial risk of harm existed. Nor is there any evidence which supports a conclusion that Defendant Trent drew such an inference.

In arguing otherwise, the plaintiff alleges that he filed three transfer requests prior to the

9

August 2009 assault, each one expressing concern about other inmates possibly attempting to harm him.

The plaintiff attached the three grievance forms as exhibits to his complaint. (Docs. 1-1, p 2, 1-2. P.2, 1-3, p.2). First, Defendant avers that none of these requests are in the plaintiff's administrative file. (Doc. 30-1, p.1). Therefore, the defendant maintains that he did not receive a request or grievance from the plaintiff regarding relocating within the NCRJ, and therefore, could not have known of an excessive risk to his safety. Second, plaintiff's administrative file reflects that on April 27 and 28, 2009, prior to the assault which is the subject of this complaint, the plaintiff did submit written requests to the NCRJ shift leader asking to be relocated. (Id.) On April 28, 2009, the plaintiff's request was granted. (Id.). Moreover, even in the absence of a formal request, the plaintiff was again relocated in June of 2009. Plaintiff states in his Response to the Motion for Summary Judgment [DE 48, p. 3] "importantly, prior to the beating of the Plaintiff, multiple requests to the NCRJ shift leader does in fact infer Plaintiff's fear(s) and reasoning(s) and concerns as to why Plaintiff wants/ needs to be moved if you why was Plaintiff moved?! The knowledge and information to/of Shift Commander is imputed to administrator - George Trent. Therefore all requests and grievances submitted are attributed to Defendant." This simply shows Plaintiff wants the Court to attribute knowledge to George Trent that Plaintiff did not directly provide to him and cannot show was passed on to him by others. The undersigned is not disposed to make such a quantum leap. There is no affidavit averring that Defendant Trent had any actual knowledge that: Plaintiff's jail cell had been ransacked; inmates had seen Plaintiff's medical records; inmates knew of Plaintiff's sexual orientation; or inmates were disposed to or were planning to harm Plaintiff because of his medical condition and/or sexual orientation. There is no affidavit averring that

Defendant Trent had any conversations with any corrections officer related to moving Plaintiff from one pod to another or concerning any reasoning for moving Plaintiff from one pod to another. Defendant Trent must be aware of the risk of serious harm before he can be found to have failed to act with deliberated indifference to it. Farmer v. Brennan, *supra* at 836. Simply stated, Trent cannot be found to have consciously disregarded a risk of which he had no knowledge. Whitley v. Albers, *supra* and Moore v. Winebrenner, *supra.* Third, to the extent that the Plaintiff did communicate concern to staff at the NCRJ, he was apparently moved by staff from one pod to another. Plaintiff admits that he was moved three times between April 22, 2009, and the assault on August 7, 2009. (Doc. 1, p. 4). Accordingly, to the extent staff knew of Plaintiff's concerns, staff acted to move Plaintiff away from the danger. Plaintiff cannot prove that staff was deliberately indifferent. Moreover, in the continuum of time between April 22, 2009 and August 9, 2009 not once in any of the three allegedly filed grievances did Plaintiff mention Cheevers or any other inmate by name as a potential assailant. Either Plaintiff did not know who might strike or knew and chose not to tell. In any event, without such information, there is no basis to conclude that Trent or any of the NCRJ staff acted unreasonably or with deliberate indifference toward Plaintiff. What it does show is that the defendants had no knowledge of potential risk to the plaintiff. Therefore, the plaintiff cannot demonstrate that the defendant knew of and consciously disregarded an excessive risk of harm to his health and safety

Finally, the Eighth Amendment, rather than the Fourteenth Amendment, is the primary source of protection of an inmate's right to be free from violence while incarcerated. Pressly v. Hutto, 816 F.2d 977 (4th Cir. 1987). Therefore, the undersigned recommends that under the facts of this case, Plaintiff Chase is unable to establish a violation of his Eighth or his Fourteenth Amendment due

11

process rights.

## V. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the defendant's Motion to Dismiss (Doc. 29) be **GRANTED**, and the complaint be **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief can be granted.

Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket The Clerk is further directed to provide a copy to all counsel of record via electronic means.

DATED: October 16, 2012

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE